Tomas ROSARIO, Ovidio Vega and Ray Cabel, Plaintiffs,

v.

Abe DOLGEN, Individually and as Manager of Amalgamated Ladies' Garment Cutters Union, Local 10, International Ladies' Garment Workers' Union, and the City of New York, Defendants.

Tomas ROSARIO, Ovidio Vega and Ray Cabel, Plaintiffs,

v.

AMALGAMATED LADIES' GARMENT CUTTERS' UNION, LOCAL 10 OF I.L. G.W.U. and International Ladies' Garment Workers' Union, AFL–CIO, Defendants.

Nos. 75 Civ. 4632, 76 Civ. 3204.

United States District Court, S. D. New York.

Nov. 14, 1977.

Burton H. Hall, New York City, for plaintiffs.

Vladeck, Elias, Vladeck & Lewis, P. C., by Stephen C. Vladeck, Robert L. Jauvtis, New York City, for defendant Abe Dolgen, individually.

Emil Schlesinger, New York City, for defendant Local 10 and for Abe Dolgen, as Manager of Local 10.

Max Zimny, by Gwen J. Lourie, New York City, for defendant ILGWU.

W. Bernard Richland, Corp. Counsel, New York City, by Richard Steinberg, New York City, for defendant City of New York.

## MEMORANDUM OPINION

MOTLEY, District Judge.

These are two actions brought by three concededly "dissident" members of Local 10, Amalgamated Ladies' Garment Cutters' Union (Local 10) charging that Local 10, its former manager, Abe Dolgen (acting in both his individual and official capacities), and the parent union, International Ladies' Garment Workers' Union, AFL–CIO (ILGWU), have all, in various respects, acted to abridge both the substantive and procedural rights afforded them by Title I of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. §§ 401 et seq. Jurisdiction is predicated upon Section 102 of the L.M.R.D.A., 29 U.S.C. § 412. Additionally, plaintiffs have asserted a pendent state claim against Dolgen and the City of New York in the first action.

At the outset, the court has decided to consolidate the two cases. As will become readily apparent from the discussion of the two complaints, infra, the allegations constituting the federal claims in the two actions describe a pattern of union disciplinary activity springing from a single incident in January of 1975. To continue to treat these two actions as separate cases, even with the different named defendant parties, would be the height of formalistic folly. Accordingly, the court orders the cases consolidated, as it clearly can on its own motion. 5 Moore's Federal Practice, ¶ 42.02, at 42–7 (2d ed. 1976).[1]

In both cases, the various defendants have moved to dismiss the complaint. The City has moved to dismiss, pursuant to Rule 12(b)(1), Fed.R.Civ.P., on the ground that the court lacks jurisdiction of the claim asserted against it. The remaining defendants in the first action have sought dismissal on the ground that the complaint fails to state a claim upon which relief can be granted, Rule 12(b)(6), and, in the case of Local 10, on the ground that the action is moot. Since Dolgen and Local 10 have accompanied their motions with substantial evidentiary affidavits, the court will treat their motions as requests for summary judgment. Rule 12(b). Plaintiff has cross-moved for summary judgment of liability on two issues. In the second action, both Local 10 and the ILGWU have moved for summary judgment and plaintiff has cross-moved for a preliminary injunction and for leave to file a supplemental complaint. For the reasons set forth infra, plaintiffs' motions for summary judgment, for leave to file a supplemental complaint, and for a preliminary injunction will be granted. The various motions to dismiss will be granted in part and denied in part, as indicated.

---

1. The cases collected in that citation make clear that the court can order consolidation even over the objection of a party, as in this case.

Although certain of the facts in this case are bitterly contested, the main outlines of the case are reasonably clear and may be set forth to place the disputed issues in perspective. A brief consideration of the complaints will serve to indicate some of the problems presented by this case.

## FACTS

The first complaint alleges that, prior to the events in question, all three plaintiffs were members in good standing of Local 10, and that they had been actively opposed to the policies and practices of the incumbent officialdom of that Local, including defendant Dolgen, who was its Manager. On January 29, 1975, the plaintiffs allegedly entered Dolgen's office, at his invitation, to protest alleged discrimination in the employment referral practices of the Local and of Dolgen in particular. Subsequently, after a period of time, Dolgen left the office and returned in the company of two New York City police officers. After some discussion, the substance of which is in dispute, the police officers left with Rosario and Vega. According to plaintiffs, defendant Dolgen instructed the officers to place them under arrest; according to Dolgen and Local 10, no such instruction was ever given at the office, and the police were merely asked to remove the plaintiffs who were allegedly obstructing union business.

2. Plaintiffs were specifically accused of the following transgressions of the union constitution:
"1. Interfering with the functions and powers of officers, business agents, representatives, employees and agents of Local 10, I.L.G.W.U. . . .
"2. Interfering with the functions and powers of Local 10, I.L.G.W.U. . . .
"3. Disobeying and failing to comply with orders and decisions of officials of Local 10, I.L.G.W.U. . . .
"4. Action and conduct detrimental to the interests of the I.L.G.W.U. and of Local 10. . . .
"5. Action and conduct unbecoming a member, occurring in connection with membership in the I.L.G.W.U. and employment in its jurisdiction. . . ."
Those specifications of misconduct were alleged, respectively, to have been in violation of the following provisions of Section 1, Article 20 of the I.L.G.W.U. constitution which provides that "[a] member may be censured, fined, suspended, expelled or otherwise disciplined

According to the complaint, defendant Dolgen, "acting in his individual capacity", thereafter filed intra-union charges against plaintiffs on or about February 10, 1975. The charges, filed with the Secretary of the Executive Board of Local 10, alleged that plaintiffs violated certain portions of the union constitution [2] "[i]n that on January 29, 1975 each in conjunction with each other, jointly took possession of the office of the Manager of Local 10, obstructed and interfered with the conduct of the usual business of Local 10, interfered with the functioning of the business agents and officers of Local 10, and refused to leave said office when ordered to do so by officers of Local 10.

"And further, in that Raymond Cabel subsequently left the office of the manager, proceeded on to the waiting room in the premises of Local 10, and sought to provoke physical action against the elected administration of Local 10, by members of Local 10 who were in such waiting room."

Plaintiff alleges that "[t]he charges filed by Dolgen as foresaid were and are false and were filed by him in an attempt to inhibit, impair and/or intimidate plaintiffs in the exercise of rights guaranteed them by the LMRDA."

"(e) for assuming, usurping or interfering with the functions or powers of, or without authorization acting in any manner as, an officer, executive board member, business agent, representative, employee or agent of the I.L.G.W.U. or of a subordinate organization;
"(f) for assuming, usurping or interfering with the functions and powers of the I.L.G.W.U. or a subordinate organization or supporting an organization which does so;
"(g) for disobeying or failing to comply in time with an order or decision of the I.L.G.W.U., G.E.B. [General Executive Board] or a subordinate organization;
"(i) for any action or conduct detrimental to the interests of the I.L.G.W.U. or a subordinate organization;
"(*l*) for any action or conduct unbecoming to a member which occurs in connection with his membership in the I.L.G.W.U. or employment in its jurisdiction [.]"

It is further alleged, and not contested, that the charges preferred against plaintiffs were heard by the Executive Board of Local 10, sitting as a grievance committee,[3] on February 25, 1975, and that plaintiffs were found guilty as charged. Beyond the fact that a trial took place and that plaintiffs were disciplined, very little about the February 25 hearing is not in dispute. Plaintiff alleges that defendant Abe Dolgen, although the charging party, "participated actively as Chairman" of the Executive Board and as a member thereof during the conduct of the trial, the deliberations following trial, and the formulation of decision. The complaint further alleges that "[c]ertain persons, business agents of Local 10 who were witnesses to the events in question, and who testified in support of the charges at the said trial, also participated as members of the trial body in the conduct of the trial, the trial body's subsequent deliberation, and its decision." To rebut these allegations, Local 10's attorney has submitted copious affidavits, notably those of Nat Klein, the Secretary of the Executive Board, which seek to establish that Dolgen and the other business agents did not improperly participate in the deliberations, and were not members of the Executive Board, but merely performed their proper and circumscribed functions as charging party and witnesses, respectively. Plaintiff Rosario has duly submitted a responsive affidavit challenging the veracity of defendants' account of the proceedings, and again asserting that Dolgen "formally chaired" the meeting and "directed proceedings". At the very least, it is safe to conclude that the "facts" concerning this disciplinary hearing are in dispute—a dispute which is not satisfactorily resolved by the simple assertion in Klein's affidavit that Dolgen was not officially a member of the Executive Board.

By letters dated February 28, 1975, plaintiffs were separately notified of the decision of the Executive Board. In part, the letter recited that "the Executive Board has voted to suspend you from participation in all Union activities for a period of one year from the date of this decision. This does not prevent you from taking up such business as a member may properly have in the Union office, as long as you do not interfere with the operation or activities of the Union office."

Plaintiffs duly appealed the decision to the Appeal Committee of the General Executive Board (GEB) of the I.L.G.W.U. That body reversed the Executive Board's decision. While noting that "[o]n the evidence in the record, the Local 10 Executive Board could properly have found the accused guilty as charged", the Appeal Committee remanded the case to Local 10's Executive Board on the ground that that body had improperly permitted Dolgen and his witnesses to be present during the deliberations on the charges in question. The Appeal Committee ostensibly assumed that the reason for the continued presence of Dolgen and the witnesses had been that the disciplinary hearing had preceded a regular business meeting of the Executive Board, at which Dolgen and the other officer-witnesses would ordinarily present reports. The Committee also made clear that "[t]here [was] no evidence in the record, and none was presented by the accused, that any of the persons involved in the hearing as a charging party or as a witness, participated in or influenced the decision appealed from." However, to avoid any appearance of impropriety, the punishment was vacated, and the charges remanded with instructions to Local 10's Executive Board to make its decision in executive session.

By letter to the Secretary of the Executive Board, Dolgen again preferred the identical charges against plaintiffs, and these charges were heard by the Executive Board on May 21, 1975. According to the complaint, "[t]he executive board which conducted the second trial . . . was substantially the same executive board that had conducted the [first] trial. . . ." Plaintiffs allege, and defendants do not dispute, that several members sat on both trials, both of which unanimously found

**3.** Article 21, Section 3 of the I.L.G.W.U. Constitution.

them guilty as charged and imposed identical punishments. According to plaintiffs, utilization of the same body for retrial—a procedure sanctioned by the union constitution [4]—resulted in a trial body whose members were "biased" against plaintiffs, and who had prejudged plaintiffs guilty of the charges against them.

In a separate assignment of error, plaintiffs allege that the Executive Board at the second trial was "controlled and manipulated" by defendant Dolgen who, in so controlling and manipulating it, was "actuated by malice", presumably against plaintiffs herein. As with respect to the charges of impropriety directed toward the first trial, defendants have submitted affidavits seeking to establish that the allegations regarding manipulation are unfounded. Rosario, in response, has submitted an affidavit alleging that, among other things, "Dolgen sat in the audience and directed proceedings from there. . . ." Suffice it to say that the actual facts concerning Dolgen's role in the second trial proceeding are also in some dispute.

At each of the trials at the Local level, \plaintiffs allege that they requested the right to make their own record of the proceedings, whether by tape recording or by bringing a competent stenographer. Although defendants dispute whether plaintiffs ever requested to bring a stenographer, as opposed to a tape recorder, they admit that plaintiffs were not permitted to make an electronic record of the proceedings, and they have, in the affidavit of the Secretary of the Executive Board, made clear that the Local would not have permitted the use of a stenographer even if it had been requested.

Plaintiffs further allege that, subsequent to each of the trials described above, they requested the right to examine the official, non-verbatim minutes of the trials which had been taken by a member of the Executive Board, but that they were denied the right to inspect such minutes.

Subsequent to the second trial, plaintiffs again appealed to the Appeal Committee of the GEB. By letter dated July 28, 1975, plaintiffs were notified that the Appeal Committee had rejected their appeal and affirmed the decision of the Executive Board of Local 10. All assignments of error were rejected. The Committee held (1) that plaintiffs had presented no evidence to support their charge that the Executive Board was biased and had prejudged their case, and that such a conclusion could not be drawn merely from the fact that the same body heard both cases; (2) that plaintiffs had presented no more than a "bare, unsubstantiated statement" that Dolgen controlled and manipulated the hearing and decision at the second trial; (3) that the minutes prepared by the Executive Board were accurate, plaintiffs having presented no evidence to the contrary; (4) that plaintiffs were not entitled to a copy of the minutes of the trials below; [5] (5) that the

---

4. Section 9 of Article 22 provides that "[n]o person shall be tried twice by the same body on the same charge, except where a retrial has been ordered by an appellate body."

5. The Appeal Committee specifically indicated as follows:

"Appellants' contention that they were denied access to the record and therefore unable properly to prepare their appeal, is without merit. What is involved is not access to the record, but appellants' demand for a copy of the Minutes of the May 21 hearing. The procedure under the ILGWU Constitution, adopted by the membership of the Union at convention, and readopted by convention after convention (the last of which was in 1974), is that minutes of a disciplinary proceeding are prepared by the secretary of the trial body, who is a member of the Union, and are filed in the office of the Union. If an appeal is taken, a copy of the minutes is forwarded to the appellate body. Copies of such minutes are not provided to either the charging party or the person charged. From their appearance before the G.E.B. Appeal Committee at the first appeal in connection with these same charges appellants were aware that at the appeal hearing, the minutes and any other pertinent material in the record would be read in their presence, and the opportunity afforded them to point out any errors or omissions. Also, they were advised in the letter notifying them of the appeal hearing date, that they could present any evidence they wished in support of their appeal, subject only to the requirement that it be relevant. For their own reasons, they chose a procedure which prevented this process from coming into

Executive Board had properly refused to allow plaintiffs to make a tape recording of the proceedings;[6] and (6) that plaintiffs' statements denying the charges were refuted by the "overwhelming weight" of the evidence of their guilt.

In September of 1975, plaintiffs brought this first action naming as defendants Dolgen, individually and officially, and the City of New York. The federal claim, predicated upon the events above set forth, asserted that the Executive Board had imposed the disciplinary punishment above described in retaliation for plaintiffs' exercise of the critical rights guaranteed them by the L.M. R.D.A., and that the punishment was therefore in violation of 29 U.S.C. § 529.[7] The complaint further alleged that plaintiffs had been denied the "full and fair hearing" guaranteed them by 29 U.S.C. § 411(a)(5)(C),[8] for the particular reason that the members of the trial body which imposed the discipline upon plaintiffs were biased against them and had prejudged their case. Furthermore, the complaint alleged that the disciplinary punishment imposed was invalid on its face, in that it "purports to deny to members of a labor organization rights and privileges guaran-

teed them by the LMRDA." Plaintiff further alleged consequent damage to reputation and mental suffering. A second cause of action, discussed in greater detail below, asserted a state tort claim against Dolgen (in his individual capacity) and the City of New York. The relief requested included (1) a declaration that the punishment in question was "null, void, and invalid", (2) an injunction restraining "defendant Local 10" and its agents from giving any effect to the punishment; (3) compensatory damages of $10,000 for each plaintiff for the alleged violations of the L.M.R.D.A.; (4) compensatory damages of $10,000 for each plaintiff from defendant Dolgen, individually, and/or the City of New York on the pendent state count; (5) punitive damages of $25,000 for each plaintiff from defendant Dolgen (without specifying whether in his individual or representative capacity); and (6) costs and attorney's fees.

It turned out, however, that the filing of the first suit was but another chapter in the tortuous history of this intra-union litigation. By decision of October 8, 1975, the General Executive Board of the ILGWU, on its own motion,[9] reviewed the decision of

---

play." [The latter statement presumably refers to the fact that plaintiff chose not to appear personally at the appeal hearing, but rather to rest on their written submissions.]

6. "The Local 10 Executive Board properly refused to allow the appellants to make an electronic recording of the hearing. Under our Constitution, there is only one official record of a disciplinary proceeding, prepared by the secretary of a trial or appeal body. The wisdom of this rule has been corroborated by the evidence in recent public history of the manner in which 'tapes' can be manipulated."

7. That section provides, in pertinent part, that "[i]t shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter."

8. Section 411(a)(5) provides as follows: "No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written

specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing."

9. Under the I.L.G.W.U. constitution, there is no appeal of right from an appellate decision of the GEB Appeal Committee to the full General Executive Board itself. The only appeal of right is from the Appeal Committee to the next triennial or special convention of the I.L.G. W.U. which, in this case, was not scheduled until May of 1977. However, the GEB may, *on its own motion*, "review, affirm, modify or reverse" a decision of the Appeal Committee, and a decision of the GEB may likewise be appealed, as of right, to the next triennial or special convention of the I.L.G.W.U. Article 23, Section 5.

The GEB decision of October 8, 1975 does recite that ". . . the three accused members of Local 10 have failed to utilize their right under the I.L.G.W.U. Constitution to appeal to the full General Executive Board . . . from the attached decision of its Appeal Committee. . . ." However, it seems clear from a plain reading of the constitution that plaintiffs' "appeal" to that body would have been entirely at the discretion of the GEB itself.

the Appeal Committee and directed that the charges be reheard *de novo* by a Trial Committee of Local 10 under certain specified conditions.[10] The events incident to this appellate direction and the subsequent, third disciplinary hearing by Local 10 form the subject matter of plaintiffs' second complaint, filed in late July of 1976.

The next regularly scheduled membership meeting was to be held on November 24, 1975. Plaintiffs allege that Local 10 failed to give its members "full notification" of the November 24 meeting and that, "as a result of such failure the actual attendance by members at the said meeting was unusually low and allowed for a greater than usual domination of the meeting by the incumbent officers of Local 10." Affidavits submitted by plaintiffs and defendants are in disagreement as to whether the notice for this meeting differed in any material respect from that given for any other meeting. Moreover, they differ further as to the reasons for the lower attendance at the meeting.

The meeting was, in any event, held on November 24, and a Trial Committee was elected. Plaintiffs allege that the Trial Committee was selected over their objections, in that the election was held by an open hand vote (rather than by secret ballot) and "in such a manner that persons selected and hand-picked by the Manager of Local 10 and by others allied with him, were elected." They further allege that the members of the Trial Committee were "allied with the incumbent officialdom of Local 10 and biased against each of plaintiffs because of the plaintiffs' opposition to the officers." Not surprisingly, Local 10 vigorously excepts to these conclusory allegations and has submitted extensive affidavits by both the members of the Trial Committee and also by Nat Klein, the Secretary of Local 10's Executive Board, averring that the Trial Committee was not selected in an undemocratic manner, that its members were not "hand-picked" by Dolgen, and that they were able to render—and did render—an unbiased opinion on the charges preferred against plaintiffs.

Plaintiffs were duly notified of the Trial Committee hearing scheduled for December 18, 1975. Prior to the date of the hearing, plaintiffs requested by letter that they be supplied with copies of the official minutes of the two previous trials which had resulted in disciplinary action against them (February 25, 1975 and May 21, 1975) and also the minutes of the GEB Appeal Committee hearings on April 8, 1975 and July 22, 1975. The stated ground for these requests was that "[t]hese minutes are necessary for [plaintiffs] to have a fair opportunity to prepared [sic] and present a defense at the

10. "It is the decision of the GEB that because of the special circumstances surrounding the case, and the fact that the charges have already been heard twice by the Executive Board of Local 10, the charges shall be reheard *de novo* by a Trial Committee of Local 10, under the following conditions:

"(1) The Trial Committee shall be composed of rank-and-file members of Local 10 and shall consist of five (5) members and two (2) alternates selected by the membership of Local 10 at the next general membership meeting of the Local. Persons serving on the Trial Committee shall not have previously been involved in hearing the charges or in making the charges or in defending against them.

"(2) The Trial Committee shall select one of its members as Chairman. It shall also select a Secretary from among its members who shall prepare the official minutes of the hearing which shall be filed in the offices of Local 10. The official minutes or true copies thereof shall be made available for inspection in the offices of Local 10 by either the charging party or the accused upon their written request therefor. True copies of the minutes shall be furnished if so requested in writing.

"(3) Should the Trial Committee find the accused or any of them guilty, any penalty which might be imposed shall not include

trial. . . ." The requests were denied by both Local 10 [11] and the I.L.G.W.U. [12]

On December 18, plaintiffs appeared at the Trial Committee hearing and insisted upon the right to make their own tape recording of the trial. According to the complaint, "it would have been futile for them to have appeared, alternatively, with a court reporter or competent stenographer for the purpose of making a record, and the futility of such an appearance was made manifest by previous statements and denials of their previous requests." As noted previously, subsequent admissions in affidavits submitted by Local 10 make it clear that the latter statement is correct, and that neither stenographer nor tape recorder would have been permitted. [13] Because of plaintiffs' insistence on their right to make a tape recording of the proceedings, the hearing was adjourned until January 8, 1976. In a letter to Rosario dated December 24, 1975, the chairman of the Trial

Committee indicated that the meeting was adjourned "to give you an opportunity to decide whether you would proceed with the hearing without a tape recorder or any other electronic recording device and advised you that if you again produced a tape recorder or any other electronic recording device, the hearing would proceed in the absence of the accused." In response to a reiterated request for minutes of prior trials and appeals, the chairman said, "I cannot go into the question, at this time, of the minutes you [have requested]. Neither I nor the Trial Committee can make any ruling until we hear the arguments why these documents are necessary to prepare for a new trial and why the minutes requested have been refused. Our Trial Committee will make this ruling only if you appear at the adjourned hearing without a tape recorder or any other electronic recording device and after we hear the arguments." [14]

disqualification as a candidate for Union office."

11. Counsel for Local 10 indicated the basis for his refusal in a letter to plaintiffs' counsel: "I believe it to be the better part of wisdom not to give any copies of these minutes to anybody. The Grievance Committee decision for the first time was reversed by the GEB Appeal Committee and remanded for a new trial. The new trial which was subsequently held was reversed by the GEB itself at its meeting on October 8, 1975, and the charges remanded for a new trial by a trial committee elected by the membership of Local 10 for a new hearing. The election will take place November 24, 1975.

"I believe that giving minutes which set forth the particulars of either of the former trials before the Grievance Committee of Local 10 would be highly prejudicial to Messrs. Cabel, Rosario and Vega and not in the best interests of Local 10 and its members. If copies of these minutes should be given to Messrs. Cabel and [his lay counsel] or to you and should be reproduced and handed out to members of Local 10, some of whom may be elected to serve on the Trial Committee or handed out to members of the Trial Committee after they have been elected, they would be extremely prejudicial.

"The proceedings at the Executive Board of Local 10 sitting as a Grievance Committee with respect to the charges filed by Dolgen individually against Cabel, Rosario and Vega, are as dead as a 'dodo' since they have been mooted by the decision of the GEB on October 8, 1975. I prefer, in the interests of a fair new trial, and

have so advised [the Secretary of the Executive Board], that they remain so."
In a later letter to plaintiff Rosario, Local 10's counsel again indicated that "[t]hese minutes are not available to anybody since the General Executive Board ordered a new trial on the merits. They are not necessary for you to prepare a defense since you do not know who will be the witnesses in support of Brother Dolgen's charges against you or what their testimony will be."

12. The Assistant Executive Secretary of the GEB replied to plaintiffs' letter request for the minutes of the GEB Appeal Committee hearings as follows: "In the interest of a fair, impartial, and genuinely *de novo* hearing on the charges, the Trial Committee hearing ordered by the GEB, which you are apparently now preparing to attend, should be entirely separated from the hearings and decisions which preceded it; the Trial Committee should in no way be influenced or give the appearance of being influenced by the earlier hearings. Accordingly, your request for access to the minutes of the earlier hearings of the GEB Appeal Committee is hereby denied."

13. A later affidavit submitted by the President of the I.L.G.W.U. makes clear that a similar policy would have governed hearings before the GEB Appeal Committee.

14. It is not clear whether, even if the Trial Committee had decided to release the minutes of the previous trials, it would have had the authority to do so, in view of the previous

Despite the clear import of the letter from the chairman of the Trial Committee, the three plaintiffs and their lay counsel appeared at the scheduled January 8, 1976 hearing insisting upon their right to tape record the proceedings. When they refused to relinquish their asserted right to make their own tape recorded record of the hearing, the members of the Trial Committee retired to an adjacent room to conduct the trial in their absence.[15]

The precise circumstances under which this third trial was conducted are in dispute. Plaintiffs assert in their complaint, and have submitted affidavits to buttress their position, that the Trial Committee "entered another room from which plaintiffs were excluded, locked the door" and proceeded to conduct the trial in their absence and in the absence of their lay counsel. Defendants, in turn, assert through affidavits that the door to the hearing room was never locked, that plaintiffs and/or their lay counsel were free to enter and participate fully in the proceedings if only they would drop their demand that they be able to tape record the proceedings, and that, in any event, the Committee considered plaintiffs' written statements. Whatever the exact facts may be, it is clear that, due to their insistence on the right to make a tape recording, plaintiffs were excluded from this trial. By written decision dated January 29, 1976 (and received by plaintiffs), the Trial Committee sustained the first of the two charges preferred against all three plaintiffs. It suspended Rosario and Vega for a period of 18 months, and Cabel for a period of one year, from attending or participating in membership meetings of Local 10. It did not sustain the

second charge, which had been preferred against Cabel only.

Plaintiffs again duly filed an appeal to the Appeal Committee of the GEB, which met to hear the appeal on April 8, 1976. Plaintiffs appeared with their lay representatives and again insisted on the right to make their own tape recording of the proceedings. The chairman of the Appeal Committee, distinguishing between the use of a tape recorder and that of a public stenographer, which they had not requested, refused to proceed with the appeal until plaintiffs desisted from the use of the recorder. Plaintiffs refused and the hearing was thereupon adjourned *sine die*. Subsequent letters exchanged between plaintiffs and the Secretary of the Appeal Committee made clear that resumption of the hearing on the appeal was contingent merely upon plaintiffs' acquiescence in the ruling by the Appeal Committee barring their use of tape recorders. Due to their refusal to comply with that ruling, plaintiffs and the union remained in a stand-off, and the appeal was never heard.

In this posture of the union proceedings, plaintiffs filed their second suit on July 20, 1976. As in the first action, they alleged, in substance, that the disciplinary action against them was merely a pretext for retaliation against them due to their outspoken criticism of and opposition to the "incumbent officialdom" of Local 10, and was, therefore, in violation of 29 U.S.C. § 529.[16] They further alleged that the disciplinary actions violated their rights to free speech within the union and to attend and participate equally with others at union meetings.[17] Finally, they again alleged that

---

denial of those minutes by Local 10's counsel. It does seem clear, however, that the Trial Committee would not have authority to release the minutes of the appeals, which were prepared by the parent union.

**15.** Although the members of the Trial Committee apparently did not at that time indicate on what authority they intended to try plaintiffs without their presence, subsequent papers seem to indicate that such action is predicated upon Section 4 of Article 22 of the I.L.G.W.U. constitution: "If the accused member fails to

appear at the time and place designated for the trial without presenting a good reason for his absence, the trial body shall proceed to take testimony and try the case in the same manner as if the accused were present."

**16.** See note 7, *supra*.

**17.** In violation of 29 U.S.C. § 411(a)(1):

"*Equal rights*—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the

they were denied a full and fair hearing on the charges against them. They sought injunctive and declaratory relief substantially identical to that requested in the first suit, as well as an order "directing defendants to accord plaintiffs all the rights and privileges of membership in Local 10 and [the ILGWU]." And they sought compensatory and punitive damages, as well as attorney's fees and costs.

Institution of this second suit merely set the stage for further battle among these litigious parties, however. In late August of 1976, plaintiffs moved in this court for a preliminary injunction preventing Local 10 or the I.L.G.W.U. from effectuating the punishment imposed upon them by the Trial Committee's decision of January 29, 1976. After considering extensive briefs and affidavits, hearing extended argument, and taking some testimony, the court granted the motion and enjoined those defendants and their agents "from giving any force or effect to the disciplinary punishment of suspension from attending membership meetings imposed upon plaintiffs" by that decision, "pending trial and ultimate disposition of this action". As stated in its brief Memorandum Opinion of September 20, 1976, the court merely found that plaintiffs had raised a sufficiently serious question concerning their entitlement to make their own record of the disciplinary proceeding to make such preliminary relief warranted under the accepted criteria in this Circuit. *See Sonesta International Hotels Corp. v. Wellington Associates, et al.*, 483 F.2d 247, 250 (2d Cir. 1973). When defendants appealed that decision, the Court of Appeals affirmed from the bench on November 9, 1976.

With litigation temporarily at a halt in the federal court, however, activity was renewed within the Union. On December 14, 1976, the Executive Committee of the GEB rendered a "Decision"[18] concerning the charges brought by defendant Dolgen. Noting the "unusual circumstances" presented by this court's action in the case, and without establishing any precedent for any other trial or appeal, the Executive Committee decreed that "the appeal from said charges shall be heard and determined" by a Special Appeal Committee of the GEB under certain specified conditions. The "appeal" was to be heard by a committee consisting of five vice-presidents of the I.L.G.W.U., none of whom had heard the appeals previously taken in April and July of 1975 from the decision of the Executive Board of Local 10. "The appeal from the Trial Committee's decision of January 29, 1976 [was to be] a hearing *de novo* by the Special Appeal Committee." The accused and charging party were to have the right to be present in person or by lay counsel; to present any evidence they wished; to confront and cross-examine the witnesses; and to make opening and closing statements, "as is customary in disciplinary proceedings in the ILGWU." Upon written request from one of the plaintiffs, they were to be supplied with the minutes of both the first and second trials and appeals. The minutes of the "*de novo* appeal hearing" were to be taken by a certified shorthand reporter, at the I.L.G.W.U.'s expense, and copies of the minutes were to be supplied to the plaintiffs. Any penalty assessed by the Special Appeal Committee, "other than suspension from all of the rights of membership or expulsion," was not to include disqualification as a Union officer. The hearing was to be held promptly after the date of the election of officers of Local 10 in the spring of 1977, and a copy of the Committee's decision was to be sent to each of the accused. Any appeal from the decision of the Committee was to be to the next convention of the I.L.G.W.U.[19]

labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws."

18. Citing Article 3, Section 7 of the I.L.G.W.U. constitution, which gives the Executive Committee full powers of the GEB between sessions of that body.

19. "[I]n accordance with Section 5 of Article 23 of the Constitution."

Copies of the Decision were sent to the plaintiffs by letter of December 14, along with a cover letter explaining that the Decision was "in connection with the appeal" taken by plaintiffs. Copies were also sent to the charging party (defendant Dolgen), to the Chairman of the Trial Committee of Local 10, and to Local 10. By subsequent letter to the same parties dated February 28, 1977, plaintiffs were informed that, as indicated in the earlier Decision, "the Special Appeal Committee of the General Executive Board will hold a hearing *de novo* on the appeal from the Trial Committee's decision of January 29, 1976" on March 23, 1977 at the specified meeting place.

In response, plaintiff directed a letter dated March 14, 1977 to the Secretary of the Special Appeal Committee protesting against what they alleged were the Committee's attempts to retaliate against them and harass them. Specifically, they contended that, by their previous appearance before the Appeal Committee, they had exhausted their intra-union appellate remedies (at least, presumably, as far as required by the L.M.R.D.A.) and they had no further need to participate in the I.L.G.W.U.'s disciplinary proceedings. Accordingly, they indicated that they would not attend the "*de novo* hearing."

In reply (by letter dated March 16), the Secretary of the Special Appeal Committee indicated that the "hearing *de novo* on [their] appeal" would be held as previously decided. Moreover, he revealed that the Executive Board's Decision had been ratified by the full GEB on February 16, 1977. He also called to their attention Article 22, Section 4 of the I.L.G.W.U. constitution which, as indicated previously,[20] provides that "trial" may be conducted in the absence of the accused if he fails to appear without offering some good reason for his absence.

Plaintiffs did not respond to the letter. Nor did they appear at the "*de novo* hearing" on March 23, which was held in accordance with the conditions specified in the Executive Committee's Decision of December 14.

By letter of April 11, 1977, the Secretary of the Special Appeal Committee sent to plaintiffs copies of both the stenographic transcript of the hearing and also the Statement and Decision of the Committee. In brief, the Committee found all three plaintiffs guilty of the charges filed against them jointly by defendant Dolgen. The Committee did not reconsider the charge against Cabel alone, which had not been sustained by the Local 10 Trial Committee (whose finding in that regard had not been earlier appealed). It suspended Rosario and Vega from attendance at and participation in all regular membership meetings of Local 10 for a period of 18 months, and imposed a similar suspension on Cabel for a period of 12 months. All three plaintiffs were given "credit for the period during which the discipline of the Trial Committee of Local 10 was in effect, namely, from January 8, 1976 through September 20, 1976." The covering letter concerning what was now denominated the "*de novo* trial" of plaintiffs called attention to the portion of the Statement and Decision which provided that plaintiffs could appeal directly to the next convention of the I.L.G.W.U. to be held in May of 1977.

In response, plaintiff Rosario wrote, on April 14, that the Special Appeal Committee was without authority under the I.L.G.W.U. constitution to conduct any "trial" of a member, and was only empowered to decide appeals. Moreover, he argued, a decision on any "appeal" from the Trial Committee's decision of January 29, 1976 would necessarily be in contempt of this court's order enjoining both Local 10 and the I.L.G.W.U. from giving any effect to the Trial Committee's decision.

The I.L.G.W.U. did not respond to Rosario's latest communication. However, in early May, plaintiffs sought to have the I.L.G.W.U. declared in contempt of this court's September 20, 1976 order on the ground that the most recent hearing mandated by the GEB's Executive Committee

**20.** See note 15, *supra.*

represented a thinly disguised attempt to effectuate the Trial Committee's order. They also sought to have the earlier order amended to prohibit either Local 10 or the I.L.G.W.U. from conducting any further trial of plaintiffs or imposing any further punishment for the charges brought by defendant Dolgen. After considering the parties' submissions and hearing argument, the court declined, on May 13, 1977, to grant the requested relief.

In view of this defeat, plaintiffs filed their appeal to the Convention on May 16. The appeal letter argued in the alternative. If, plaintiffs argued, the decision of the Special Appeal Committee were treated as an appeal from the Trial Committee's determination in January of 1976, then they asserted that that earlier trial was unfair, substantially for the reasons set forth in this action. If the Committee's action were to be treated as an original disciplinary proceeding, they argued that the proceeding exceeded the powers of the GEB and violated the I.L.G.W.U. constitution. They also raised several other assignments of error, including those which they argue in this court.

Despite very adequate notification—which they do not dispute receiving—of the time and place of the hearing before the Appeals Committee of the Convention, they did not attend the appeal. The Appeals Committee, after considering their appeal letter and all the material available to the Special Appeal Committee of the GEB, affirmed the decision of the Special Appeal Committee in all respects. On the Appeals Committee's recommendation, the full Convention also unanimously affirmed the decision of the Special Appeals Committee.

Now plaintiffs have again come before the court, seeking (1) permission to serve and file a supplemental complaint in the second action covering the events which have transpired since the filing of their initial complaint in July of 1976; and (2) a preliminary injunction barring the defendants from giving any force or effect to the

Decision of the Special Appeals Committee (as affirmed by the Convention) or from excluding plaintiffs from attendance at or participation in any membership meetings or other meetings of Local 10. For the reasons set forth below, the court has determined that both these motions must be granted.

DISCUSSION

In the first place, the court holds that the punishment imposed upon plaintiffs is void on the ground that it impermissibly abridges rights guaranteed to them by federal law.

Briefly stated, the punishment suspends plaintiffs from participation in, or attendance at, regular membership meetings of Local 10 for varying periods of time while leaving their other membership rights unimpaired. Cabel's period of suspension has now expired; however, Rosario and Vega are still under suspension.

Plaintiffs' argument is very straightforward, but not simplistic. There is no question that plaintiffs, even under the disciplinary conditions imposed, remain "members" of the union, within the meaning of that term as defined in the L.M.R.D.A., 29 U.S.C. § 402(o). All "members" are entitled to the equal rights and privileges guaranteed a "member" by the L.M.R.D.A., 29 U.S.C. § 411(a)(1),[21] and any denial of those equal rights and privileges may be enjoined.[22] Since "members" are statutorily entitled " . . . to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings", the argument runs, plaintiffs cannot be prevented from attending membership meetings as long as they have not been suspended or expelled from the union.

The precise question is whether the strictures of 29 U.S.C. § 411(a)(1) limit the "other discipline" to which § 411(a)(5) makes reference. That latter section clearly indicates that punishments other than fines, suspension, and expulsion are available to

**21.** See note 17, *supra.*

**22.** 29 U.S.C. § 412.

the union. The issue is whether, even (as in this case) in the absence of any claim that the punishment is unduly harsh for the offense charged, or that the punishment is being discriminatorily applied to these plaintiffs (as against all others convicted of the same offense), the statute forbids unions from imposing the sanction of suspension from attendance at membership meetings.

In the court's view, the union may not impose such a suspension. The clear intent of Congress in passing a "Bill of Rights" for union members was to ensure that internal union democracy would not be sacrificed on the alter of internal efficiency, *see Navarro v. Gannon*, 385 F.2d 512, 518 (2d Cir. 1967), *cert. denied*, 390 U.S. 989, 88 S.Ct. 1184, 19 L.Ed.2d 1294 (1968), and that the rights of free expression and political participation would be carefully protected. Suspension of the right to attend membership meetings and to attempt there to sway the minds of fellow union members seems clearly incompatible with the notion that freedom of speech within the union is a right of paramount importance. It is certainly true that, in the instant case, plaintiffs have *not* been deprived of the right to run for union office or to attend Executive Committee meetings of the Local. Doubtless these are very important rights—rights which plaintiffs have been diligent in exercising. However, the availability of alternative modes of punishment, such as fines, which do not impede the rights of expression; the fact that suspension from membership meetings can so easily be used as a means of censoring dissident views; the strong policy in favor of internal union democracy; and the plain language of the statute itself all lead this court to the conclusion that a union is prohibited by statute from imposing a punishment such as that imposed in the instant case. *See Stachan v. Weber*, 535 F.2d 1202 (9th Cir. 1976).

It is urged by the union that, if the L.M.R.D.A. be so construed, unions would be precluded from imposing a penalty which falls short of suspension or expulsion from membership, with its extreme social and economic consequences. Such a ruling, it is urged, would not, in the long run, inure to the benefit of union members. In response, it need only be noted (1) that unions are still free to impose a rather broad range of less draconian "other discipline", and (2) that if Congress finds this construction improper or obnoxious, it is free to clarify the terms of the statute itself.

The court does not rest its determination that the punishment should be enjoined merely upon the impropriety of the specific mode of discipline, however. For the following reasons, the court is of the opinion that, despite the obvious care and consideration with which the most recent hearing was carried out, the plaintiffs nonetheless did ,not receive the "full and fair hearing" mandated by statute. The court comes to this conclusion reluctantly, because it is readily apparent that the I.L.G.W.U. went beyond the requirements of current law in seeking to ensure that plaintiffs received a fair hearing attended by extensive substantive and procedural safeguards. And the court is certainly mindful that repeated disciplinary hearings over a substantial period of time constitute a drain on both the manpower and financial resources of a union. However, plaintiffs are also entitled to all the "due process" which is implicit in the statutory guarantee of a "full and fair hearing".

The defect in the hearing before the Special Appeal Committee was in the notice afforded to plaintiffs of its pendency. It is, of course, well settled that the provisions of 29 U.S.C. § 411(a)(5) import a requirement that an accused union member have adequate notice of the charges against him and an opportunity to be heard in opposition thereto before any disciplinary action is taken. *See, e. g., Krulikowsky v. Metropolitan District Council of Philadelphia and Vicinity*, 212 F.Supp. 338, 340 (E.D.Pa.1962). In the instant case, unlike many cases where the notice concept is in controversy, there is no question that plaintiffs received adequate warning of the specific charges against them, and that the charges were sufficiently concrete that they

could be effectively defended against. The problem in this case is whether plaintiffs received adequate notice of the *nature of the proceeding* to be held on the charges. Specifically, the question is whether plaintiffs were adequately informed that the Special Appeal Committee would be holding a *de novo trial* on the charges, rather than an *appeal* from the earlier decision of the Local 10 Trial Committee.

The December 14, 1976 Decision of the Executive Committee of the GEB and the succeeding correspondence between that body, the Special Appeal Committee, and the plaintiffs is certainly susceptible of the inference that the new hearing was to be an *appellate* hearing. For instance, the letter of December 14 which forwarded the Decision to plaintiffs spoke of action "in connection with [their] appeal"; the Decision itself indicated that "the appeal from [Dolgen's charges] shall be heard and determined by a Special Appeal Committee . . .", that "[t]he appeal from the Trial Committee's decision . . . shall be a hearing *de novo* by the Special Appeal Committee", that "[t]he minutes of the *de novo* appeal hearing" were to be taken by a shorthand reporter, and that an appeal from the determination of the Special Appeal Committee would be taken directly to the next convention—a procedure which, under the I.L.G.W.U. constitution, is reserved for appeals from *appellate* decisions of the GEB Appeals Committee. Moreover, the letter from the Secretary of the Special Appeal Committee to plaintiffs dated February 28, 1977 advised them that that body would hold a "hearing *de novo* on the appeal from the Trial Committee's decision of January 29, 1976" in accordance with the conditions set out in the December 14 decision of the Executive Committee of the GEB.

It is certainly true that there were some clues in those documents that the "hearing" would be a trial rather than an appeal.[23]

For instance, the December 14 Decision provided that "[t]he accused and the charging party shall have the right to be present in person and/or by lay counsel *in the manner provided in the I.L.G.W.U. Constitution. . . .*" The only reference to such a right in the constitution is in Article 22, Section 3, which deals with *trial,* rather than *appellate* procedures. However, the union certainly referred to the proceeding primarily as an appeal. And it seems clear that plaintiffs regarded it as an appeal as well. Their letter of March 14, 1977 to the Secretary of the Special Appeal Committee, besides accusing that body of harassment and retaliation, made clear their position that they had, by their previous appearance before the GEB Appeal Committee in April of 1976, exhausted their intra-union *appellate* remedies as far as such pursuit was required as a precondition to suit in the federal court.[24] Accordingly, they indicated that they would not attend the hearing.

Moreover, as previously indicated, the responsive letter from the Secretary of the Special Appeal Committee continued to refer to the forthcoming proceeding as an appellate hearing, although citing a section of the I.L.G.W.U. constitution pertaining to proceeding with trial in the absence of the accused. It is only in the letter to plaintiffs of April 11, 1977 that the Secretary of the Special Appeal Committee first refers to the then-completed hearing as a *de novo* trial.

Since it is perfectly clear that plaintiffs were notified that some kind of *de novo* hearing was to be held on the charges against them, it almost appears hypertechnical to make the validity of that carefully and conscientiously planned proceeding turn upon the choice of the term "appeal" instead of "trial" in the notice afforded thereof. However, in the context of the peculiar procedural posture of the litigation in this court, it made a considerable differ-

---

**23.** The mere fact that the hearing was to have been *"de novo"* and that witnesses would be heard afresh does not indicate that it was to have been an original trial, since appeals to the GEB Appeal Committee were ordinarily con-

ducted in that manner. Affidavit of Sol C. Chaikin, sworn September 14, 1976, at p. 4.

**24.** 29 U.S.C. § 411(a)(4).

ence whether the I.L.G.W.U. was preparing to hold a trial or appellate hearing. As previously noted, this court had previously enjoined both the Local and the I.L.G.W.U. from giving any force or effect to the January 1976 decision of the Local 10 Trial Committee. Therefore, plaintiffs would have been justified in taking the position that they had no obligation to attend any appeal hearing, which would, arguably, have been in violation of this court's order. And any affirmative decision taken in their absence arguably would have been of no legal force or effect, notwithstanding the provisions of Article 22, Section 4 of the I.L.G.W.U. constitution.[25] On the other hand, nothing in the court's prior Memorandum Opinion or Order cast any doubt upon the right of the defendants, by some mechanism, to retry plaintiffs on the same charges, if they were afforded the "full and fair hearing" mandated by the L.M.R.D.A. Thus, it would have been incumbent upon plaintiffs, if they wished to make their position on the charges known, to appear at any further original disciplinary proceeding and defend themselves. Alternatively, if, as they have since contended in this court, they truly feel that they ought not to be subjected to any further trials by the Local, then, given clear notice of such a new *trial,* they would have had the opportunity to come into this court to seek injunctive relief against such further proceedings.

To inveterate litigators such as these plaintiffs, therefore, it made a considerable difference whether they were being notified of a trial or an appeal. The union's failure to make clear that the new hearing being contemplated was a trial rather than an appeal deprived plaintiffs of adequate notice of the hearing leading to the challenged suspension. The lack of notice and the subsequent trial in their absence violated their rights under 29 U.S.C. § 411(a)(5), and the suspension resulting therefrom must be enjoined.

■ It might be argued, of course, that plaintiffs could have inquired of the union to find out whether the proposed hearing

was to be a trial or an appeal. While it is by no means apparent that plaintiffs had any reason to suspect that the hearing was to be anything but an appeal, the law seems clear, however, that the onus is upon the union to provide adequate notice and there is no duty upon the accused to make such an inquiry. Nor would it have been sufficient for defendants to show, after the fact, that plaintiffs had independently obtained knowledge that the hearing was to be a trial. *See Berg v. Watson,* 417 F.Supp. 806, 811 (S.D.N.Y.1976); *Magelssen v. Local Union No. 518, Operative Plasterers' and Cement Masons' International Association,* 233 F.Supp. 459, 461 (W.D.Mo.1964).

■ Plaintiffs also argue that the challenged discipline should be set aside on the additional ground that the GEB was without authority to establish a committee of its own members to hear and determine charges made by one member of a local against another member. Although, strictly speaking, the court need not pass upon this argument since it has voided the trial and punishment on other grounds, it will do so to lay to rest this argument, should the parties choose to continue this litigation further. The argument is without merit.

Briefly stated, plaintiffs' argument is that since Article 21, Section 3 of the I.L.G.W.U. constitution explicitly requires that the grievance committee of an unaffiliated Local shall initially try charges made by one member of the local against another; since other sections of the constitution explicitly vest the GEB (or its Appeal Committee) with authority to conduct original trials of certain kinds of charges; and since nothing in the constitution explicitly gives the GEB authority to set up any special trial committees, the GEB is without any authority under the constitution to establish the sort of committee which purported to try the charges against plaintiffs in March of 1977.

In response, the I.L.G.W.U. asserts that the GEB has the requisite authority to establish a special committee to conduct such

**25.** See 29 U.S.C. § 411(b).

a trial. It notes that Article 3, Section 8 of the constitution gives the GEB "general supervisory powers over all the affairs of the I.L.G.W.U. and its subordinate organizations, including the right to . . . (d) make rules for the government of the I.L.G.W.U. and its subordinate organizations which are not inconsistent with this constitution and take such other action as it believes may be required for the welfare of the I.L.G.W.U. and such organizations; [and] . . . (h) appoint any committee or sub-committee it deems necessary to perform specified duties. . . ." Moreover, the union notes that, under Article 3, Section 8(c), the GEB has the right to "decide all questions involving the interpretation of this constitution . . ." and that, under Article 3, Section 7, the Executive Committee of the GEB has all the powers and duties of the full GEB between sessions. Thus, the union argues, the Executive Committee, in its Decision of December 14, 1976, interpreted the I.L.G.W.U. constitution to vest in the GEB a power to conduct original trials such as the one here at issue. Moreover, the full GEB ratified the Executive Committee's interpretation at its meeting on February 16, 1977, and the full triennial convention of the I.L.G.W.U. in turn ratified that interpretation in May of 1977.

Plaintiff urges the applicability of the maxim *inclusio unius est exclusio alterius,* arguing that the provision for trial of such charges by the local's grievance committee necessarily implies that such charges are not to be heard by other bodies. On the other hand, the I.L.G.W.U. stresses the "plenary" nature of the grant of authority to the GEB found in Article 3, Section 8.

This court deems it inappropriate to make its own determination of this interpretive question, however, for the reason that "[c]ourts are reluctant to substitute their judgment for that of union officials in the interpretation of the union's constitution, and will interfere only where the official's interpretation is not fair or reasonable." *Vestal v. Hoffa,* 451 F.2d 706, 709 (6th Cir. 1971), *cert. denied,* 406 U.S. 934, 92 S.Ct. 1768, 32 L.Ed.2d 135 (1972); *accord, English v. Cunningham,* 108 U.S.App.D.C. 365, 282 F.2d 848 (1960). The court cannot say that the interpretive judgment of the GEB was so lacking in basis as to warrant judicial reexamination and reversal. Particularly in a situation in which plaintiffs themselves are now arguing that they can no longer receive a fair trial at the local level after three prior disciplinary proceedings in a Local in which they are prominent members of the opposition, the court can certainly see a reasonable basis for a constitutional construction which seeks to find an escape from that impasse which is fair to both charging party and accused. Certainly the GEB could conscientiously seek to find a new and, hopefully, impartial tribunal to bring an end to intra-union litigation acquiring a certain degree of notoriety. The GEB's interpretation, while not *necessarily* that which the court might make, was certainly reasonable and proper. As such, it will not be disturbed.

■ Plaintiffs' fourth and final ground for issuance of the injunction is that the imposition of the suspension by the Decision of the Special Appeal Committee constitutes double punishment for the offense charged, in that the Trial Committee's January, 1976 suspension is still extant, although defendants are enjoined from enforcing it. This argument is totally frivolous. As previously indicated, nothing in the court's prior pronouncements cast any doubt upon the defendants' right to retry plaintiffs on the same charges, so long as they received a full and fair hearing on the charges. Indeed, the Decision of the Special Appeal Committee, while imposing suspensions of the same duration as those previously imposed by the Trial Committee, reduced those periods by the amount of time that the Trial Committee's order had been outstanding before its enforcement was enjoined by this court. There has been no double punishment and, in the absence of any showing of bad faith enforcement of the union rules, there is nothing in this opinion which necessarily bars a procedurally correct new trial.

The above discussion is dispositive of the request for injunctive relief concerning the discipline imposed by the "Special Appeal Committee", and also of the motion to file a supplemental complaint, since the allegations contained therein are of some substance. This disposition, along with the court's previous injunction concerning the January 1976 suspension order, obviously renders unnecessary any further discussion of the plaintiffs' previous requests for injunctive relief. However, as indicated previously, their two complaints also seek awards of compensatory and punitive damages. Thus, consideration of defendants' various motions to dismiss and of plaintiffs' cross-motion for summary judgment, is still necessary.

### Dolgen's Motion to Dismiss

■ Based upon the facts alleged in the first complaint, i. e., through September of 1975, Dolgen, *sued as an individual*, has moved to dismiss the federal claim against him for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.[26] This motion is granted.

The complaint is not a model of clarity and it is often difficult to perceive which of the alleged acts of Dolgen were assertedly performed in his capacity as an individual, rather than in his capacity as an officer of Local 10. However, the essential allegations seem to be, first, that he deliberately filed false charges against the plaintiffs in an effort to inhibit them from exercising their rights under the L.M.R.D.A.; and, second, that he "maliciously" interfered with and manipulated the actions of the trial body at the first two trials in a successful effort to obtain disciplinary action against plaintiffs.

The legal question is whether these allegations state a claim under the L.M.R.D.A.

One very clear line of authority holds that they do not. In what has become the leading case on the subject, the Court of Appeals for the Third Circuit carefully considered the legislative history of Title I of the L.M.R.D.A. to determine whether that legislation "regulates the conduct of private individuals not acting as agents or representatives of any labor organization." *Tomko v. Hilbert*, 288 F.2d 625 (1961). The court's conclusion was that "the LMRDA does not provide a civil remedy for the vindication of rights contained in the bill of rights against one who in violating such rights is not acting in the capacity of an official or agent of a labor union." 288 F.2d at 625–6. "Private misconduct which incidentally may frustrate appellant's rights as a union member does not give rise to an action under the bill-of-rights section." 288 F.2d at 629. This case has been followed, for example, in *Cox v. Hutcheson*, 204 F.Supp. 442 (S.D.Ind.1962) (filing of false union charges by an individual) and in *Cole v. Hall*, 35 F.R.D. 4 (E.D.N.Y.1964) (conspiracy to deprive a member of his union rights).

In rebuttal, plaintiff has cited two cases in which recovery was apparently allowed against an individual acting in a private capacity, for alleged violations of the, L.M.R.D.A. In *Sands v. Abelli*, 29 F.Supp. 677 (S.D.N.Y.1968), disciplinary charges had been filed against the original plaintiff, Solomon Salzhandler, by Isadore Webman, president of the local union. Salzhandler was tried on those charges by the union trial body (of which Webman was not a member) and suspended. He then sued the union and Webman, recovering punitive damages from both. However, it is not clear in the opinion whether the damages were being recovered from Webman in his private or official capacity, as the court does not discuss the issue.[27] In view of the

---

**26.** Due to the fact that the motion is accompanied by affidavits, it will be treated as a motion for summary judgment. Rule 12(b).

**27.** In any event, the District Court was merely carrying out the mandate of the Court of Appeals which had reversed an earlier decision

and directed entry of judgment for the plaintiff, remanding the case to the District Court for assessment of damages and entry of an injunction. *Salzhandler v. Caputo*, 316 F.2d 445, 451 (2d Cir.), *cert. denied*, 375 U.S. 946, 84 S.Ct. 344, 11 L.Ed.2d 275 (1963). The Court of Appeals had not considered the question of Web-

fact that counsel fees were later assessed against Webman "as President of Local 442", however, it seems more likely that his liability was official, rather than individual.

Plaintiff also cites *Robins v. Schonfeld,* 326 F.Supp. 525 (S.D.N.Y.1971). In that case, the plaintiff, who had been wrongfully punished by the union District Council, sued the Council, the Local, and Thomas Guinta, the president of the Local, who had brought the charges against the plaintiff. Guinta was not found liable as an individual for lack of proof, but was assessed attorney's fees. The court did not discuss the distinction between Guinta's liability as an individual and as a union officer.

In view of the fact that the cases which have carefully considered the question whether an individual—not acting in an official capacity—may be found liable for a violation of the L.M.R.D.A. have uniformly and persuasively concluded that he may not, the court does not find the *Sands* and *Robins* cases persuasive. Accordingly, insofar as the complaint seeks to hold Dolgen, in his unofficial capacity, liable for damages due to alleged violations of the L.M.R.D.A., it must be dismissed.

However, Dolgen is sued in his capacity as Manager of Local 10, as well, and the law is clear that individual defendants may be held liable under the L.M.R.D.A. if their improper acts are done under color of union authority. *Morrissey v. National Maritime Union of America,* 544 F.2d 19, 24 (2d Cir. 1976). Because (a) the complaint does not make clear precisely which actions Dolgen is alleged to have taken in his official capacity, and because (b) the facts surrounding his attendance at and/or participation in the first two disciplinary trials (at which he is *apparently* alleged to have acted officially) are in dispute, the motion to dismiss the complaint against him as Manager of

the Local must be denied. *See Stein v. Mutuel Clerks Guild of Massachusetts,* 384 F.Supp. 444, 448–9 (D.Mass.1974).

Before further discussion of the various motions to dismiss, it is useful to summarize plaintiffs' claims under the L.M.R.D.A., as gleaned from the two suits.

First, they assert that all the punishments thus far imposed upon them, *i. e.,* from the second trial (as upheld by the July 1975 appeal), the third trial (by the Local 10 Trial Committee in January 1976), and the hearing before the Special Appeal Committee of the GEB, are facially invalid as being inconsistent with their rights as union members. For the reasons set forth *supra,* the court agrees. The discipline imposed in all three instances contains the common element of suspension from participation in general membership meetings.[28] Therefore, *plaintiffs* are entitled to summary judgment on this issue.

Second, they assert that they were denied a "full and fair hearing" at the first two trials in that (a) Dolgen, the charging party, allegedly chaired the hearing or otherwise "manipulated" the trial body, (b) they were denied the right to make their own stenographic or tape recorded record of the proceedings, (c) they were denied the right to examine the "official" minutes after their trials by Local 10 in order to prepare for their appeals, and (d) the trial body was biased and prejudiced against plaintiffs, particularly when, at the second trial, they had allegedly prejudged plaintiffs' guilt since they had already found them guilty at the first trial.

Third, they assert that, with respect to the third trial, they were denied a full and fair hearing in that (a) they were not provided with copies of the official minutes of the two previous trials in order to prepare for the third trial, (b) they were not permit-

---

man's *individual* liability under the L.M.R.D.A. The Court merely reversed a previous dismissal of Salzhandler's complaint, holding that "the LMRDA protects the union member in the exercise of his right to make [charges of impropriety by union officers] without reprisal by the union; that any provisions of the union constitution which make such criticism, whether libe-

lous or not, subject to union discipline are unenforceable; and that the Act allows redress for such unlawful treatment." 316 F.2d at 446.

**28.** Although, as noted *supra,* the first suspension included participation in all union activities.

ted to make their own record of the proceedings with a tape recorder, (c) the trial was "arbitrarily and without good reason" conducted in their absence, and (d) the trial committee failed to "make or have made an accurate stenographic or other record of the proceedings." [29]

Fourth, they assert that the charges against them were "false" and that the discipline imposed upon them with relation thereto is invalid and an illegal means of retaliation against them for their expression of dissident views.

■ Those claims which are not yet resolved and which remain necessary for disposition will be dealt with *infra*. However, it is appropriate at the outset to dispose of the contention made by Local 10 that the decision of the I.L.G.W.U.'s General Executive Board in October of 1975, remanding the charges for a third trial, rendered the federal claims of the first complaint moot. As previously indicated, plaintiffs sought not only injunctive and declaratory relief, but also damages for injury to reputation and mental suffering, which are clearly compensable elements of damages. *See Simmons v. Avisco*, 350 F.2d 1012, 1019–20 (4th Cir. 1965). The conclusory affidavits submitted by the Local are clearly insufficient to establish that no such damages were, in fact, sustained. That is an issue for trial, and the plaintiffs' federal claims are not entirely moot.

### Exhaustion

In both actions, Local 10 [30] and the I.L.G. W.U. have sought to dismiss the federal claim on the ground that plaintiffs failed to exhaust their remedies within the union structure. These motions were made prior to the creation of the Special Appeal Committee, and the subsequent disciplinary proceeding before that body. Since plaintiffs carried their appeal from the resulting decision to the triennial convention of the I.L.G. W.U.—the highest level of appeal permitted by the union constitution—it is clear that the issues relative to that "special" proceeding have been adequately presented to the I.L.G.W.U. for internal consideration prior to the filing of the supplemental complaint covering the events subsequent to July of 1976.

However, the question remains whether plaintiffs prematurely instituted the two basic actions at issue in this case.

■ The statutory requirement [31] that union members be required to exhaust "reasonable hearing procedures" within the union for a four-month period before instituting legal action against the union or its officers is a discretionary one, *Detroy v. American Guild of Variety Artists*, 286 F.2d 75 (2d Cir.), *cert. denied*, 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed.2d 388 (1961) and is subject to some clearly recognized exceptions. Most pertinent to this case is the principle that exhaustion is not required where further intra-union appeals would have been futile. *Farowitz v. Associated Musicians of Greater New York*, 330 F.2d 999 (2d Cir. 1964).

■ With respect to the allegations of impropriety concerning the first two trials (contained in the first complaint filed in September of 1975), the court is clearly of the view that plaintiffs adequately exhausted their union appeals before bringing suit. In each case, they perfected their appeals to the Appeal Committee of the General Executive Board of the I.L.G.W.U. In each

---

**29.** Paragraph 18 of the second complaint alleges that "[d]espite demands made by plaintiffs, the trial committee further failed to make or to have made an accurate stenographic or other record of the proceedings." This allegation clearly asserts an obligation of the *union* to prepare some sort of record, rather than the right of plaintiffs to have a record of their own prepared, presumably at their own instance and expense. Although plaintiffs have not subsequently sought to support this position, it

remains in the complaint and the court will assume that it has not been abandoned.

**30.** Local 10 is not, of course, named as a defendant in the first suit, although the complaint does refer (in spots) to "defendant Local 10". However, Dolgen is there sued in his official capacity as Manager of the Local and, as such, he is being represented by the Local's counsel.

**31.** See note 24, *supra*.

case, a decision was rendered by the Committee. As previously indicated,[32] the only appeal *of right* from a decision of the Appeal Committee is to the next convention of the parent union which, in this case, was scheduled for May of 1977—a period clearly beyond the four-month waiting period required by the statute. While the full GEB may, on its own motion, review determinations of the Appeal Committee, such a review is obviously discretionary with the GEB and it would not be reasonable to require aggrieved union members to await a review to which they are not entitled, and which they might not receive at all. The fact that the second appeal in this case was, in fact, reexamined and vacated by the full GEB—a month after the first suit was instituted—is purely fortuitous.

■ A somewhat more difficult question is presented by the allegations of impropriety concerning the third trial, conducted on January 8, 1976, which are contained in the second complaint. As previously indicated, plaintiffs took a timely appeal to the GEB Appeal Committee which first met to hear the appeal on April 8, 1976—a bit over two months after the Trial Committee rendered its decision against plaintiffs. The ostensible reason that the appeal was never heard was that plaintiffs refused to abide by the ruling of the Appeal Committee that they must not tape record the proceedings. The I.L.G.W.U. argues, naturally enough, that plaintiffs frustrated the hearing of their own appeal by their obstreperous refusal to abide by the procedural rules established by the Appeal Committee. Plaintiffs argue that the Committee's refusal to proceed to hear the appeal was arbitrary and unwarranted.

This court obviously has no desire to impede enforcement of the union's procedural

rules or to enable union members to sidestep union appeals and make an end run for federal court whenever it suits their purposes. However, in this case, the court is convinced that the purposes underlying the exhaustion rule were duly served by plaintiffs' intra-union appeals prior to institution of the second federal action. *See Detroy, supra,* at 79. The GEB Appeal Committee had, on the second appeal, made clear, *inter alia,* that, in its view, there was sufficient evidence to support the charges against plaintiffs, and also that plaintiffs were not entitled to tape record the appeal. Thus, there was little likelihood that the third appeal would render the case moot, and the Committee had already rendered a decision on the main outstanding procedural issues (notably the tape recording issue) and has set forth its reasons therefor. As subsequent events in this case have shown, further judicial insistence on pursuit of the union appeal would not have resulted in an alteration of the Appeal Committee's position on the salient issues—on which it was at loggerheads with plaintiffs. Nor would pursuit of the appeal have provided further enlightenment for this court, or resulted in anything more than a repetition of appeals previously held on issues previously determined. Accordingly, the court holds that plaintiffs' failure to continue with the third appeal (in April of 1976) and to again press their substantive and procedural points in the union forum is not a bar to institution of the second action in this court.[33]

■ The I.L.G.W.U. strenuously asserts that plaintiffs failed to exhaust their intra-union remedies against the *parent* union in that they never filed charges against the GEB, as provided by Article 21, Section 12 of the union constitution. However, charges against the GEB are referred to the

---

**32.** See note 9, *supra*.

**33.** It is noteworthy that, in an affidavit subsequently submitted to this court, President Sol C. Chaikin of the I.L.G.W.U. has stated, pursuant to his constitutional authority to interpret the union's constitution, that plaintiffs' failure to abide by the prohibition against tape recorders or stenographers at trials or appeals would authorize the trial or appellate body to determine the charges against them in their absence. Thus, the GEB Appeals Committee *could* have proceeded with plaintiffs' appeal despite their refusal to attend without a tape recorder. The court's action in entertaining the second suit in no way prevented the Appeal Committee from ruling on plaintiffs' appeal if they had wished to do so.

I.L.G.W.U.'s convention, which was not scheduled to meet for over a year after plaintiffs reached their deadlock with the Appeals Committee. Since the statute requires that they exhaust reasonable hearing procedures only for a period of four months, it clearly would have been a futile gesture for them to have instituted charges which *could not* be determined within that period.

### Denial of a "Full and Fair Hearing" at the First Three Trials

The court does not find it necessary to discuss each and every allegation of impropriety concerning the three trials held at the Local level, and the first two appeals, for it holds that, on two separate grounds, plaintiffs were denied the full and fair hearing required by 29 U.S.C. § 411(a)(5).

■ Plaintiffs claim that they were denied a full and fair hearing in that they were not permitted to make either a tape recorded or stenographic record of the trials and appeals *for their own use.* The court agrees. Although the parties are in dispute as to whether plaintiffs ever requested to bring a stenographer, as opposed to a tape recorder, the August 30, 1976 affidavit of Nat Klein, Secretary of the Local 10 Executive Board, makes clear that Local 10 would not have permitted them to bring a stenographer in any event, even at their own expense. Moreover, the September 14, 1976 affidavit of the President of the I.L.G.W.U. indicates that a similar policy would have applied to hearings before the GEB Appeal Committee. Accordingly, it appears immaterial to the court whether plaintiffs ever formally asked to bring a stenographer or not.

With respect to the tape recorder, the Local's position is clear and was made clear to the parties during the litigation. In the Local's view, tape recordings are subject to manipulation, splicing, and erasure, and are therefore susceptible to the efforts of disgruntled and unscrupulous litigants who may endeavor to distort the record of the proceedings.

More generally, the union objects to the presence of either tape recorder or a stenographer brought by the parties on two principal grounds. First, the Local urges that union disciplinary proceedings are conducted informally by laymen and should not be overlaid with the formalisms which might attend a criminal trial in courts. Secondly, they argue that Article 22, Section 2 of the I.L.G.W.U. constitution,[34] which makes provision for the official minutes of such hearings, implicitly prohibits the accused from making such a record for himself (although the accused would be free to take his own hand-written notes of the proceedings). As construed by the GEB Appeal Committee,[35] this provision dealing with the official, non-verbatim record of the proceedings precludes the accused from making what is, at least potentially, a more complete and accurate record of the proceedings at his own expense. The Local urges that the opportunity always afforded the accused at his appeal to comment upon the accuracy of the official minutes of the trial provides a sufficient opportunity for the accused to ensure that the minutes accurately reflect the substance of the hearing.

The court has been cited no authority which has gone so far in importing the concepts of due process as to hold that it is incumbent upon the union to *provide* a stenographer (or other verbatim recording mechanism) in order to afford an accused union member a "full and fair hearing". *But see Deacon v. Operating Engineers, Local 12*, 59 L.R.R.M. 2707, 2709 (S.D.Cal. 1965). One court has explicitly held that the use of a court reporter is not a necessary element of a full and fair hearing.[36]

---

**34.** "The secretary of a grievance, trial or appeal committee shall file the minutes of all trials and appeals in the office of the union of which it is a part."

**35.** See note 6, *supra*.

**36.** It is worthy of note that Congress rejected a version of Section 101(a)(5) of the L.M.R.D.A., 29 U.S.C. § 411(a)(5), sponsored by Senator McClennan, which would have explicitly re-

*Kiepura v. Local Union 1091, United Steelworkers of America,* 358 F.Supp. 987, 992 (N.D.Ill.1973). Particularly in the circumstances of this case, the court need not go so far as to require the union to provide a stenographer or tape recorder in every case. Especially in view of the expense of providing competent stenographic service, such a holding would impose a substantial burden upon a union's resources, and could fundamentally change the relatively informal adjudicatory processes which unions have traditionally been allowed to employ.

However, it is quite another thing to hold, as does this court, that the Local denies the accused a full and fair hearing when it precludes him from either tape recording the hearing or providing a competent stenographer at his own expense to make a record for his own purposes, whatever they may be. The union is free to continue to regard the nonverbatim minutes taken by the Secretary of the trial body as the "official" minutes of the proceeding. If an accused is sufficiently concerned about the accuracy of the official minutes that he is willing to either bring a tape recorder or a competent stenographer at his own expense, however, the court can perceive no reason why a union should not allow the accused to do so, unless it is, in fact, attempting to conceal inaccuracies in its own minutes. Although the Local argues that a stenographer employed by the accused might wilfully falsify the record, the court does not deem this contention worthy of serious discussion. And, while it is certainly true that tape recordings can be manipulated and are often unintelligible when several persons are speaking at once, the union, if it suspects that a recording is not accurate, can have such a recording electronically tested to determine whether it has been tampered with, and can have its own transcript prepared from the recording.

As for the contention that the opportunity to correct the minutes on appeal provides a sufficient guaranty of their accuracy, it seems obvious to the court that such a right could be illusory when the challenged minutes can only be compared with the accused's own nonverbatim, handwritten notes of the proceedings. If the accused can provide his own tape recording or transcript of the proceedings, it would seem much more likely that an appellate body would be receptive to allegations of impropriety concerning the record prepared by the trial body.

It may be argued, of course, that if accused union members invariably avail themselves of the opportunity to make their own record of the proceedings, then the result will be pressure upon the union to make its own verbatim record—with attendant expense—to protect itself and ensure the accuracy of the accused's record. While that conceivably could be the case, that is a result dictated by the union's own prudence, rather than by a holding of this court that the L.M.R.D.A. requires it to do so. However, it seems unlikely that accused union members would, in the majority of cases, be so suspicious of the good faith of the trial bodies and the accuracy of the hearing minutes as to go to the trouble of making their own record.

In holding that Local 10 and the I.L.G. W.U. denied plaintiffs a full and fair hearing by denying them the right to make their own record by tape recorder or stenographer, this court merely makes explicit what the court circuitously did in the *Kiepura case, supra.* That court refused to hold that "the use of a court reporter is a necessary element of a 'full and fair hearing' ", but it did hold that, in the circumstances of that case, the union's refusal to allow the plaintiff to supply a court reporter at his own expense was "an abuse of discretion which did tend to deprive him of such a hearing." 358 F.Supp. at 992. This court can perceive no reason why such a refusal should be couched in terms of "abuse of discretion" rather than in terms of deprivation of a full and fair hearing.

---

quired a written transcript of any disciplinary hearing. Department of Labor, *Legislative History of the Labor-Management Reporting and Disclosure Act of 1959,* p. 248.

Plaintiffs further contend that they were denied a full and fair hearing by Local 10 at the second trial in that the Executive Committee of the Local which retried them was composed of many [37] of the same individuals who had tried them the first time, and who had thereby necessarily prejudged them guilty. Thus, they argue, they were deprived of the impartial tribunal which is a requisite of a full and fair hearing. *Stein, supra.* For purposes of ruling upon this contention, the parties are in agreement that there was some overlap of attendance between the two meetings of the Executive Board.

This contention does not present a legal issue of first impression. It is well established that an accused union member is not afforded a full and fair hearing if a member of the tribunal trying him has prejudged his guilt. *Falcone v. Dantinne,* 420 F.2d 1157 (3rd Cir. 1969). That principle has led at least one court to hold that a second trial by a tribunal of which only one of three members had previously sat at a previous trial and there adjudged the accused guilty is sufficiently unfair as to violate the accused's right to a fair hearing. *Cefalo v. Moffett,* 78 L.R.R.M. 2112 (D.D.C. 1971).

This court agrees that plaintiffs did not receive a fair hearing at the second trial. Particularly in view of the fact that the GEB Appeal Committee had already (on the first appeal) expressed its view that there was adequate evidence to support a finding of guilty, it seems unreasonable to suggest that a committee of laymen could view the charges, which they had already considered, with a completely open mind. Certainly no criminal charges are ever remanded to the same jury for a second trial. The opportunity to be tried before an unbiased tribunal is so fundamental that its absence renders any hearing unfair. Under the circumstances of this case, plaintiffs did not receive a fair hearing at their second trial by the Local. Accordingly, the provision of the I.L.G.W.U. constitution authorizing retrial before the same tribunal [38] is, as applied here, inconsistent with federal law and void.[39]

### The Allegation of "False" and Improperly Motivated Charges

As indicated above, plaintiffs allege that the charges against them were "false" and that the discipline imposed upon them with relation to the charges is invalid because it was an illegal means of retaliation against them for their expression of dissident views.

The scope of judicial review of union disciplinary hearings under 29 U.S.C. § 411(a)(5) is strictly limited. The court must determine whether there was "some evidence" to support the charges made. *International Brotherhood of Boilermakers v. Hardeman,* 401 U.S. 233, 246, 91 S.Ct. 609, 28 L.Ed.2d 10 (1971). *Accord, Burke v. International Brotherhood of Boilermakers,* 302 F.Supp. 1345, 1350 (N.D.Cal.1967), *aff'd* 417 F.2d 1063 (9th Cir. 1969). "A stricter standard . . . would be inconsistent with the apparent congressional intent to allow unions to govern their own affairs, and would require courts to judge the credibility of witnesses on the basis of what would be at best a cold record." *Hardeman, supra,* 401 U.S. at 246, 91 S.Ct. at 617. For purposes of evaluating whether plaintiffs received a "full and fair hearing", the motive of the accuser in bringing charges is irrelevant, as long as the charges are supported by the evidence. *Burke, supra,* at 1353; *Pittman v. United Brotherhood of Carpenters & Joiners,* 251 F.Supp. 323, 324 (M.D.Fla.1966).[40]

---

**37.** The December 19, 1975 affidavit of Nat Klein, Secretary of the Local 10 Executive Board makes clear (at page 12) that there was some overlap in attendance of members of the Executive Board between the two trials.

**38.** See note 4, *supra.*

**39.** 29 U.S.C. § 411(b).

**40.** *Leonard v. M.I.T. Employees' Union,* 225 F.Supp. 937 (D.Mass.1964) is not to the contrary. Although the court does say that ". . . these charges were only a pretext and the real purpose of the board was to get rid of Leonard because he was an opponent and critic of the union officers and their policies", 225 F.Supp. at 939, the basis of the court's

The charges, on their face, allege conduct, to wit, engaging in a sit-in, disrupting union operations, and inciting violence, which, if proven, could properly be the subject of union disciplinary action, whatever its political aim. *Cf. Gulickson v. Forest,* 290 F.Supp. 457 (E.D.N.Y.1968) (plaintiff disciplined for what he did, not what he said or wrote).

■ If there was evidence before the disciplinary tribunals which could support those charges, the court need not inquire into the motivation for their filing as part of its inquiry whether plaintiffs received the full and fair hearing mandated by 29 U.S.C. § 411(a)(5)(C). *Burke, supra,* at 1353.

■ It is clear that the allegation that the charges preferred against plaintiffs were "false", *i. e.,* totally unsupported, states a claim against Local 10,[41] which adjudicated the charges.[42] *See Leonard v. M.I.T. Employees' Union,* 225 F.Supp. 937 (D.Mass.1964). In seeking to definitively rebut that allegation, the Local has submitted multiple affidavits purporting to establish that the charges were factually grounded, and that the punishment was supported by evidence presented to the various trial bodies. While the version of the incident in Dolgen's office set forth in these affidavits is at variance in many respects with that offered by plaintiffs in their affidavits, this disparity was clearly for the union's disciplinary body to resolve, and is not subject to *de novo* re-examination by

this court. *Hardeman, supra.* Accordingly, even in the presence of some factual dispute, there was clearly "some evidence" to support the finding of the Local's disciplinary body, and the Local is entitled to a summary judgment that the trials were not thereby "unfair".

■ Plaintiffs allege, of course, not only that they were denied a full and fair hearing under 29 U.S.C. § 411(a)(5)(C), but also that the motivation of the various trial bodies in imposing the discipline was to inhibit their expression of dissenting views, in violation of 29 U.S.C. § 529, a statutory section whose application frequently requires a motivational inquiry into all the circumstances surrounding the "discipline" in question. Broadly read, this allegation challenges the impartiality of the disciplinary tribunals and clearly states a claim under the L.M.R.D.A. *See, e. g., Kuebler v. Cleveland Lithographers,* 473 F.2d 359 (6th Cir. 1973); *Stein, supra.* However, despite a plethora of affidavits attesting to the honesty and good character of the members of the Executive Committee and Trial Committee of Local 10, the responsive affidavits submitted by plaintiffs raise factual issues which are not susceptible of summary determination. Defendants' motion for summary judgment on the Section 529 claim must be denied.

### Plaintiffs' Second Cause of Action in the First Suit

As indicated *supra,* plaintiffs' first complaint included a second cause of action,

---

holding that the plaintiff's expulsion was unlawful was its finding that the charges were not supported by any "substantial evidence". *Id.*

**41.** Although plaintiffs do not, in their second complaint naming Local 10 as a defendant, allege that the charges were "false", they do allege that the punishment was imposed upon them in retaliation for their exercise of rights guaranteed by the L.M.R.D.A. Presumably, in view of the allegations of the first complaint, of which the second is really a continuation, plaintiffs continue to imply that the charges are "false" at the third trial which is the subject of that complaint.

**42.** For the reasons stated *supra,* that allegation does not state a claim against defendant Dol-

gen, as a union member, for pressing the charges. Although the Local itself is not named as a defendant in the caption of the first action, plaintiffs do refer, in their complaint and elsewhere, to "defendant Local 10". Thus the court will assume that that omission was a pleading error. Moreover, since Dolgen is also named in the caption as Manager of Local 10, it is perhaps unnecessary to name the Local itself as a defendant. *See Cole v. Hall, supra,* at 7: ("It is true that he does not mention the Union as a party but since he sues the officers in their representative capacity, it is unnecessary for him to specifically designate the Union as a defendant.")

denominated an action for "false arrest and malicious prosecution", against Dolgen and the City of New York.

The claim is pleaded against the two defendants in the alternative. First, plaintiffs allege that Dolgen, on January 29, 1975, caused certain New York City police officers to arrest plaintiffs Rosario and Vega and take them into custody, without "just or lawful cause", that he further "falsely instructed" the police that he intended to press criminal charges against Rosario and Vega; that Rosario and Vega were consequently held in police custody for over five hours and were, against their will, "subjected to many and various personal indignities by such police officers"; and that, because Dolgen caused a summons to be served upon Rosario and Vega on or about January 29, 1975, they subsequently appeared in Criminal Court in response thereto and were required to remain in court for more than four hours.

Alternatively to the allegation that Dolgen *caused* the police to arrest the two plaintiffs, they allege that certain police officers arrested them, without being instructed to do so by any complainant and without probable cause to believe that they had committed any criminal offense or violation.

▋ As a claim for malicious prosecution, the second cause of action is defective in that it fails to plead that the criminal proceeding against the plaintiffs was terminated in their favor, *Broughton v. State of New York,* 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310 (N.Y.), *cert. denied sub nom. Schanbarger v. Kellogg, et al.,* 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975).

▋ Indeed, the complaint does not specify what, if anything, transpired at the Criminal Court. However, the complaint does state a claim for false arrest (or false imprisonment) against both Dolgen and the City. *See Broughton, supra.*

▋ Although the complaint does state this cause of action, the further question arises whether this claim ought to be entertained by the court as properly within its pendent jurisdiction. Insofar as the City is concerned, it is now clear that there is *power* in the federal courts to adjudicate state law claims against defendants who are not parties to the principal federal claims. *Astor-Honor, Inc. v. Grosset & Dunlap, Inc.,* 441 F.2d 627 (2d Cir. 1971). Moreover, in the court's view, this state claim *should* be adjudicated in the same proceeding with the remaining questions under the L.M.R.D.A.

While the complaint must be dismissed against Dolgen in his private capacity, the lack of clarity in the complaint as to exactly which, if any, actions were taken by him under color of his union authority as Manager of the Local and the factual dispute concerning his role at the first two trials will require that that issue be resolved at trial.[43] Thus, Mr. Dolgen remains a defendant in this suit, although in his official capacity. To the extent that his good faith in exercising his authority may become an issue bearing upon his federal liability, *see Berg v. Watson,* 417 F.Supp. 806, 812 (S.D. N.Y.1976), it does seem entirely possible that evidence bearing upon the events constituting the state law claim may be both relevant and material to the federal claim as well. Since the additional increment of evidence necessary to adjudicate the claim against the City will be minimal, considerations of sound judicial administration lead to the conclusion that the false arrest claim should be tried jointly with the federal claim in this action.[44] Accordingly, the motions to dismiss the pendent claim are denied.

*Summary*

To reiterate, (1) 75 Civ. 4632 and 76 Civ. 3204 are ordered consolidated; (2) plaintiffs are entitled to a summary judgment (a)

---

**43.** Unless it is clarified on further motion practice.

**44.** The fact that, as argued by counsel, the state claim arguably "arose" *before* the federal claim "arose" is by no means dispositive of the pendent jurisdiction issue.

that the suspensions imposed upon them are invalid and (b) that they did not receive a full and fair hearing at the first two trials by the Local and on the first two appeals by the GEB Appeal Committee in that they were not allowed to make their own record of the proceedings and they were re-tried by the same tribunal; (3) the allegations that Dolgen, in his private capacity, violated plaintiffs' rights under the L.M.R.D.A. are dismissed; (4) Local 10's motion to dismiss the claim under 29 U.S.C. § 529 is denied; (5) the malicious prosecution claim is dismissed; and (6) plaintiffs' motions for a preliminary injunction and for leave to file a supplemental complaint are granted.

The following issues remain for disposition: (1) whether the discipline imposed by the disciplinary bodies of Local 10 was imposed by them in retaliation for plaintiffs' exercise of protected rights under the L.M.R.D.A.; (2) whether plaintiffs suffered any compensable injury which was the proximate result of their being wrongfully disciplined; (3) the amount, if any, of compensatory damages for any such injury; (4) whether Abe Dolgen, acting under color of and in abuse of his union office, contributed to the denial of plaintiffs' L.M.R.D.A. rights and, if so, what proportion of plaintiffs' damages, if any, was due to his misconduct; (5) whether an award of attorney's fees is appropriate on the L.M.R.D.A. claim and, if so, the amount thereof; (6) whether defendants Dolgen and the City of New York are liable to plaintiffs Rosario and Vega under state law and, if so, what is the amount of plaintiffs' compensatory damages thereunder; (7) the assessment of punitive damages, if appropriate.